# Exhibit C

## True Public Marina Lease

Case 5:25-cv-00159-MEO-DCK    Document 1-3    Filed 10/02/25    Page 1 of 17

Prepared By: Karol P. Mack, Deputy General Counsel, Duke Energy

Site: 007327
Land Unit: 0049475
Project No: 007327-374973

**STATE OF NORTH CAROLINA**

**COUNTY OF IREDELL**

## TRUE PUBLIC MARINA LEASE

### Queens Landing
### Lake Norman, Catawba-Wateree Hydroelectric Project (FERC Project No. 2232)

**THIS LEASE** is made and entered into by and between **DUKE ENERGY CAROLINAS, LLC**, a North Carolina limited liability company ("Lessor"), and **ESTATE OF JACK R. WILLIAMS** ("Lessee"); each singularly called a "Party" and collectively called the "Parties";

### WITNESSETH:

**WHEREAS**, Lessor owns, leases or otherwise controls substantial equity interests in that certain property described herein lying within the Project Boundary, more particularly within the lake bed and upland of the lake bed of Lake Norman (the "Lake") in Iredell County, North Carolina, which is part of Lessor's Catawba-Wateree Hydroelectric Project (FERC Project No. 2232) (the "Project"), for which Lessor holds a license to operate (the "License") and which Project is subject to regulatory oversight by the Federal Energy Regulatory Commission ("FERC" or "Commission"); and

**WHEREAS**, Lessee desires to use Project property described herein for the purposes described in Paragraph 2 of this Lease, and Lessor is willing to allow the use of said property pursuant to the terms and conditions recited herein.

**NOW THEREFORE**, Lessor, for and in consideration of Ten Dollars and No/100 ($10.00) and other valuable considerations, and the covenants and agreements hereinafter expressed, to be kept and performed by Lessee, hereby grants and Lessee hereby accepts a Lease, subject to the exceptions and reservations and upon the terms and conditions and for the purposes in this instrument set out, to use the following property located in Iredell County, North Carolina, hereinafter sometimes referred to as the "Leased Premises," to wit:

All that tract of land containing 2.31 ± acres, lying within and adjoining the Lake, as shown on that certain plat entitled "Pier Lease Survey of Queens Landing for Jack Williams," dated July 31, 2008, attached hereto as **Exhibit A** and incorporated herein by reference.

1. Term: This Lease shall begin on ___5___ ___June___, 20_19_, (the "Effective Date") and shall expire at the end of the term of the License granted to Grantor by the FERC effective November 1, 2015 (including any extension periods of the License as may be granted by the FERC through annual licenses or otherwise, but not including the next new or subsequent license the FERC may issue after the expiration of the License), unless terminated sooner pursuant to Paragraph 16 of this Lease. Lessor may terminate this Lease at any time if directed to do so by FERC or its successor agency having jurisdiction over hydroelectric reservoirs that are subject to the Federal Power Act or if necessary to comply with FERC requirements.

*Form rev. 3.20.18*

1

2. <u>Permitted Uses</u>: The Leased Premises may be used by the Lessee as a True Public Marina and recreation area offering to the public four (4) cluster docks with a total of thirty-five (35) boat docking locations and one (1) courtesy dock, all as shown on the attached survey (**Exhibit A**) and as approved by FERC on December 2, 2008 FERC ¶ 125, 62,199(the "FERC Order").

   If, as a part of this Lease, Lessor has approved construction of new facilities, such facilities must be constructed within eighteen (18) months from the date of Lessor's letter notifying the Lessee that their application has been approved. A one (1) year extension may be considered if the Lessee files a written request with Lessor prior to the eighteen (18) month deadline, which sets forth the reasons the facilities will not be completed within the allotted timeframe. If an extension of time to complete construction of the facilities is requested by the Lessee and granted by Lessor, additional requirements may be placed on Lessee to meet revised regulations or shoreline development guidelines.

3. <u>Rental</u>: See **Exhibit B** attached hereto and incorporated herein by reference.

4. <u>Maintenance</u>: Lessee recognizes that it has the continuing responsibility to ensure that the constructed facilities are maintained in good repair, including, but not limited to maintenance of all constructed facilities and any required navigation or public safety devices and required erosion control along the shoreline within the Leased Premises, and agrees to take all reasonable steps necessary to meet this responsibility. Lessee shall cause all structures within the Leased Premises to be maintained in a sound condition and in a neat appearance at no cost to Lessor.

   Lessee, at no cost to Lessor, shall be responsible for the removal of any sunken boats or disabled boats within the Leased Premises.

5. <u>Improvements</u>: Lessee shall not make material alterations or improvements upon the Leased Premises or conduct excavation or shoreline stabilization activities within the Leased Premises without the prior written approval of Lessor. Lessee shall request Lessor's approval in writing and shall include detailed plans of all proposed material alterations, improvements, excavation or shoreline stabilization activities; including but not limited to construction plans and elevation drawings in substantial compliance with Lessor's Shoreline Management Guidelines then in effect. Proposed alterations, improvements, excavation or shoreline stabilization activities that do not require any additional entity or FERC review shall be approved or denied by Lessor in its sole discretion. Major additions and/or modifications, excavation and shoreline stabilization will typically require review and/or approval by other entities and may require approval by FERC. If the proposed alterations, improvements, excavation or shoreline stabilization activities require review and/or approval by other entities, the Lessee shall first submit draft plans to Lessor for review and initial comment. Once Lessor's initial comments, if any, have been addressed by Lessee, Lessee shall submit the revised draft plans, if any, to the other required entities for their review, comment and/or approval. Lessee shall address the additional comments received prior to submittal of the final plans to Lessor for final approval. If such plans require FERC approval, Lessor will forward such plans to FERC for review and approval. FERC will provide Lessor with its approval, approval with modifications, or denial in the form of a FERC order or letter. After receiving any applicable FERC order or letter, Lessor will provide Lessee with Lessor's final decision (i.e., approval, approval with conditions/modifications or denial - including a reasonable basis for such approval with conditions/modifications or denial.)

Case 5:25-cv-00159-MEO-DCK    Document 1-3    Filed 10/02/25    Page 3 of 17

Lessor shall not be obligated to approve additional material alterations, improvements, excavation or shoreline stabilization activities and retains the right to conditionally approve or deny any requested alterations, improvements, excavation or shoreline stabilization activities.

6. Illegal Uses:   Lessee shall not make or allow to be made any illegal use of the Leased Premises or any use thereof constituting a public nuisance, and shall keep the Leased Premises in a neat and orderly manner and shall comply with all applicable building codes and health regulations and with the rules and regulations of any relevant governmental authority.   All water and sanitary sewer facilities shall be designed, installed, constructed, maintained and operated only with the approval of the applicable governmental authorities.

7. Lessee Ownership or Other Interest in Adjoining Property:  This Lease is made subject to and contingent upon Lessee's owning, leasing or otherwise having an interest at all times during the term hereof in the shoreline property adjoining the Leased Premises. If Lessee, at any time during the term of this Lease, does not own, lease or otherwise have an interest in the shoreline property adjoining the Leased Premises, then in such event, Lessor may cancel this Lease (subject, however, to Lessee's right to cure the violation as set forth in Paragraph 16 hereof) and require Lessee, at its expense, to remove its marina facilities from the Leased Premises.

8. Transfer or Assignment:  The Lessee may not transfer or assign this Lease or let or sublet the whole or any part of the Leased Premises to anyone without the prior written consent of the Lessor.

9. Entry by Lessor:  Lessor, its agents and representatives, at all reasonable times may enter the Leased Premises to examine same and any such entry by or on behalf of Lessor shall not be or constitute an eviction, partial eviction or deprivation of any right of Lessee and shall not alter the obligations of the Lessee hereunder or create any right in Lessee adverse to the interest of Lessor.

10. Utility Easement:  Lessor reserves an easement to build, construct, maintain and operate electric distribution/transmission lines on, over, along and above the Leased Premises.  Lessor also reserves the right, privilege and easement to erect, construct, reconstruct, replace, maintain and use towers, poles, wires, crossarms and other appliances and fixtures for the purpose of transmitting or distributing electric power, for said Lessor's communication purposes, and for any other purpose that is in Lessor's sole discretion consistent with its business operations, together with the right to keep said lines, appliances, and fixtures free of structures, trees and other objects that may endanger or interfere with same.

11. Indemnity:  Lessee will indemnify and save harmless Lessor, its successors and assigns, from and against any and all claims arising from any conduct, management, operation, work or thing done in or about the Leased Premises or any building, structure or equipment thereon during the period of this Lease or arising from any act or failure to act by Lessee, its agents, contractors, employees or sublessees, or arising from any accident, injury or damage whatsoever, however caused, to any person or persons or to the property of any person, persons, corporation or corporations during the period of this Lease on, in or about the Leased Premises and from and against all costs, counsel fees, expenses, liabilities and damages incurred in or about such claims or any action or proceeding brought thereon, and in case any action or proceeding be brought against Lessor, its successors or assigns, by reason of any such claim, Lessee, on notice from Lessor, shall resist and defend such action or proceeding by counsel satisfactory to Lessor.

Case 5:25-cv-00159-MEO-DCK     Document 1-3     Filed 10/02/25     Page 4 of 17

Lessee hereby waives all claims against Lessor for damages to the improvements and other property that are now or hereafter placed or built on the Leased Premises caused by or resulting from intermittent flooding or drawdown of the waters of the Lake.

12. <u>Insurance by Lessee</u>:  Lessee agrees that, at its own cost and expense, it shall obtain and maintain in force during the term of this Lease the following insurance coverage and minimum insurance limits:

a) Commercial General Liability insurance from a reputable insurance company authorized to do business in South Carolina, providing coverage for any and all risks of liability associated with Lessee's occupancy and use of the Leased Premises and the activities authorized hereunder, with limits of at least $1 million per occurrence.

b) Workers' Compensation (including U.S. Longshoremen & Harbor Workers Act, if applicable) meeting statutory limits.  If Lessee is not required to have Workers' Compensation coverage by the State of North Carolina (or state where work will be performed), Lessee must give Lessor a notarized letter stating that they are exempt from the law and will hold Lessor harmless from all injury except those injuries resulting from Lessor's gross negligence; if applicable.

c) Employers' Liability Insurance (including Maritime Employers Liability) of not less than $1 million each accident; if applicable.

d) Automobile Liability Insurance of not less than $1 million each occurrence.  If the Lessee is required to use privately owned vehicles in performance of their contracted duties, the Lessee must hold the Lessor and Lessor's affiliates harmless for any liability associated with their operation of automobiles while performing work under this agreement.

e) Umbrella Liability Insurance or Bumbershoot of not less than $2 million per occurrence.

f) Liquor Liability Insurance of not less than $1 million per occurrence.

g) Pollution Liability Insurance of not less than $1 million per occurrence.

The Lessee must meet the following additional insurance-related requirements:

1. Insurance coverage must be with insurance companies with a minimum A.M. Best Rating of A-VII.

2. Lessee shall deliver to Lessor certificates of insurance prior to the beginning of the Lease and within 30 days of each insurance renewal.  The certificates of insurance shall list the coverages and limits, the expiration dates and terms of policies and all endorsements whether or not required by Lessor, and listing all carriers issuing said policies.  Lessor shall not be obligated to review any of Lessee's certificates of insurance, insurance policies, and/or endorsements or advise the Lessee of any deficiencies in such documents, and any receipt of copies or review by Lessor shall not relieve the Lessee from or be deemed a waiver of Lessor's right to insist on strict fulfillment of the Lessee's obligations.  The Lessee shall deliver a certified copy of each insurance policy including all endorsements upon request by Lessor.

3. Lessee shall name Lessor as an additional insured, using Insurance Services Office, Inc. (ISO) additional insured (CG 20 10) or equivalent, under all required policies of liability insurance (Except Worker's Compensation Insurance).  All policies shall include waivers of any right of subrogation of the insurers using standard ISO forms.  The certificate(s) of

Case 5:25-cv-00159-MEO-DCK     Document 1-3     Filed 10/02/25     Page 5 of 17

insurance shall specifically confirm the "waiver of subrogation" and "additional insured" obligations.

4.  All insurance policies shall each contain a provision that coverage will not be cancelled, not renewed, or materially modified unless at least thirty (30) days' prior written notice has been given to the Lessee. In any event, if Lessee becomes aware of any such cancellation, reduction in coverage or non-renewal, Lessee shall provide written notice to Lessor of such action within ten (10) days of receipt of notice of any such action from its carrier. All policies of insurance required shall be endorsed or shall otherwise provide that Lessee's insurance shall be primary with respect to their own acts or omissions and not be in excess of, or contributing with, any insurance maintained by Lessor. Lessee will be responsible for their own respective deductibles, self-insured retentions, and self-insurance under its insurance program.

5.  Should Lessee fail to provide or maintain any required insurance, Lessor shall have the right, but not the obligation, to provide or maintain any such insurance, and to invoice the cost to the Lessee whereupon Lessee shall reimburse Lessor annually within forty-five (45) days following the request for payment.

6.  Upon Lessee's contracting with an entity for the purpose of constructing any facilities on the Leased Premises, Lessor shall be named as an additional insured on a policy of insurance covering the scope of such activity prior to the commencement of any activity by Lessee, its agents or contractors. All policies shall include waivers of any right of subrogation of the insurers using standard ISO forms. Any contractor or subcontractor performing work on property that is the subject of this Lease shall have in place prior to commencement of any activity and during the performance of any activity, the following types of insurance and minimum coverage limits:
    - Commercial General Liability Coverage – $1 million per occurrence.
    - Automobile Liability – $1 million per occurrence.
    - Workers Compensation – Within statutory limits.
    - Employer's Liability – $1 million each accident.
    - Umbrella Liability or Bumbershoot - $2 million per occurrence.
    - Liquor Liability Insurance of not less than $1 million per occurrence
    - Pollution Liability Insurance of not less than $1 million per occurrence

13. <u>Taxes and Assessments</u>: Except as provided herein, any fees received herein are net of all taxes. Lessee shall pay when due all taxes or assessments of any kind levied against the marina facilities or Lessee's personal property located within the Leased Premises and all ad valorem taxes on the marina facilities. On the condition that the Leased Premises, exclusive of marina facilities, remains classified and taxed as utility property at the same rate as all other land of Lessor lying within the Project Boundary, Lessor shall pay the tax thereon exclusive of taxes assessed on the marina facilities. In the event, however, that as a result of this Lease, the Leased Premises, exclusive of the marina facilities, shall be classified and taxed as non-utility property or at a higher rate than other lands of Lessor lying within the Project Boundary, then in such event Lessee shall pay such amount, if any, as is equal to the taxes assessed on the Leased Premises, exclusive of the marina facilities, minus the taxes which would have been assessed if the Leased Premises had been taxed as utility property or at a rate applicable to other lands of Lessor lying within the Project Boundary. Provided however, in such event, Lessor agrees to use reasonable efforts to assist Lessee in contesting the reclassification of the Leased Premises from utility property to non-utility

Case 5:25-cv-00159-MEO-DCK    Document 1-3    Filed 10/02/25    Page 6 of 17

property with the applicable taxing authority. Lessee shall be solely responsible for listing the marina facilities in its name for tax and assessment purposes and filing any required tax return, to the extent such listing and return is required by applicable law. Upon written request, Lessee shall furnish Lessor with copies of paid receipts for all said taxes and assessments on or before the 31st day of December of each year to the extent Lessee is required by applicable law to pay said taxes.

14. Limitation of Liability: Lessor and Lessee agree to warrant that any and all work performed within the Leased Premises will be performed with professional thoroughness and using acceptable standard business practices. Lessor's total cumulative liability to Lessee for claims of any kind whether based on contract, tort (including strict liability and negligence except for gross negligence or willful misconduct on part of Lessor), under any warranty or otherwise, for any loss or damage relating to this Lease, shall in no case exceed the cost of completing the work in accordance with acceptable business practice, and Lessee releases Lessor from all further liability in excess of this amount for any work performed under this Lease. Lessee further releases Lessor from any and all liability resulting from any injury of any employee of Lessee or anyone performing any service at the direction of the Lessee on the Leased Premises, excluding any acts of willful misconduct by Lessor.

Neither Party shall be liable, whether based on contract, tort (including negligence and strict liability), under any services or work performed relating to this Lease, for any consequential, indirect, special, or incidental loss or damage, any damage (except to the extent damage resulted from willful misconduct) to or loss of any property or equipment.

This limitation of, or protection against liability shall also protect directors, officers, employees, agents, consultants, suppliers, subcontractors, and affiliated entities and their directors, officers, employees, agents, consultants, suppliers, subcontractors, parents, subsidiaries and affiliates of Lessor and Lessee and shall apply regardless of the fault (excluding willful misconduct), gross negligence or strict liability of the respective Party.

Lessee waives and will require its insurers to waive all rights to recovery and claims of any kind, including rights and claims to which its insurers or another may be subrogated, against Lessor arising out of damage to, loss of or loss of use of any Lessee's property, located on the Lake, whether based on contract, tort (including strict liability and negligence except for gross negligence or willful misconduct on part of Lessor), under any warranty or otherwise. These waivers are effective as to all damages to or losses of use of property arising out of or relating to this Lease or deficiencies in the services provided hereunder and Lessee hereby covenants that no such action or claim shall be brought by or through Lessee on any theory whatsoever. In the event Lessee or its insurers recover damages from a third party for losses or damages to which the foregoing waivers apply, Lessee shall indemnify and hold Lessor harmless against any liability for any such losses or damages which said third party recovers from Lessee and any expenses (including attorney fees and other cost of investigation and defense) related hereto.

The limitation of liability in this provision shall apply notwithstanding any other provision of this Lease.

15. Surrender of Lease: The voluntary or other surrender of this Lease by Lessee, or a mutual cancellation thereof, shall not work a merger and shall, at the option of Lessor, terminate all or any existing subleases or subtenancies or may at the option of Lessor operate as an assignment to it of any or all such subleases or subtenancies.

16. <u>Termination & Waiver</u>: It is expressly agreed and understood that this Lease may be terminated by any of the following: (1) by a written document duly approved and executed by both Parties; or (2) by written notice from Lessee of Lessee's intent to abandon the rights herein granted by Lessor; or (3) by Lessor if directed by Order of FERC (or its successor agency) or if necessary to comply with FERC requirements; or (4) by Lessor under the conditions set forth in Paragraph 7; or (5) by expiration of this Lease pursuant to Paragraph 1; or (6) by Lessor in the event of a breach of any of the covenants, conditions, terms or provisions of this Lease by Lessee, including but not limited to noncompliance with health, safety or sanitation laws, and the continuation of such breach for sixty (60) days following written notice of such breach by Lessor to Lessee; provided, that if the cure of such breach cannot reasonably be completed by Lessee within such sixty (60) day period, Lessee shall have ninety (90) days to cure such breach provided Lessee commences such cure within thirty (30) days and diligently pursues such cure; or (7) by Lessor, if at any time during the duration of this Lease (or any renewal thereof) the Lessee should be adjudged bankrupt or insolvent by any federal or state court or the Lessee shall allow a final judgment obtained against it to remain unpaid for a period of sixty (60) days.

In providing notification of a breach of covenants, conditions, terms or provisions of the Lease, as identified in Paragraph 16, Lessor will advise the Lessee of its right to present evidence regarding the claimed breach in a meeting conducted by Lessor. Notice of the meeting will be sent by Lessor to the Lessee by certified mail, return receipt requested, and include information on the date, time, and place of the meeting and possible remedies for cure. At the option of the Lessee, such a meeting will be scheduled within 60 days following the initial written notification that a breach of provisions included within this Lease has taken place.

Failure of Lessor to exercise any of said rights relating to the termination of this Lease or any other rights of Lessor under this Lease shall not be construed as a waiver or abandonment of the right thereafter to exercise any or all of same. In the event that Lessor terminates this Lease under any of the above written conditions, Lessor may enter the Leased Premises and expel the Lessee there from; or Lessor may, in lieu thereof or in conjunction therewith, pursue any other lawful right or remedy incident to the relationships created by this Lease.

Upon expiration or termination of this Lease (either at the end of the term or upon such earlier termination date as is provided herein) and notice from the Party terminating this Lease to the other Party, the Lessee shall have 180 days to submit a plan and schedule for Lessor's approval to remove the marina facilities or retire a portion of the marina facilities (e.g., shoreline stabilization, boat ramps, etc.), such approval not to be denied unreasonably. If the marina facilities are not removed or retired by the deadline approved by Lessor, the marina facilities shall become the property of Lessor and any reasonable cost of removal for those facilities that must be removed and cannot be reasonably retired shall be paid by Lessee. Lessee's obligations to remove improvements within the Leased Premises shall be limited to the marina facilities and shall not extend to removal of any improvements of Lessor or any third party. If improvements of Lessor have been installed within the Leased Premises, Lessor shall notify Lessee that Lessor will at Lessor's election either: (1) waive liability for damage to such improvements during Lessee's removal of the marina facilities; (2) remove Lessor's improvements at Lessor's sole cost prior to the removal or retirement of the marina facilities; or (3) waive any requirement that Lessee remove or retire the marina facilities at the Lessee's expense. Lessee shall use reasonable efforts to avoid damage to any improvements of Lessor or any third parties installed within the Leased Premises.

Failure to use the marina facilities for any permitted use identified in Paragraph 2 for a consecutive period of 12 months shall be deemed abandonment of the Leased Premises and shall be cause for termination pursuant to this paragraph, unless Lessee has provided notice to Lessor of its intent to continue operations within 24 months (including the 12-month abandonment period) or other mutually acceptable future date and Lessee actually resumes operations within said 24-month period or by said mutually acceptable date.

17. Remedies: In the event that any Party breaches this Lease and fails to cure the breach in accordance with the provisions of Paragraph 16, the other Party may seek compensatory damages, declaratory relief, specific performance, injunctive relief of any type, and/or sanctions for violation of any injunctive relief previously granted.

18. Parties Bound: The covenants and conditions herein contained shall apply to and bind the heirs, successors, executors, administrators, and assigns of the Parties hereto; provided, however, that neither this Lease nor any interest therein may be assigned, transferred or sublet by Lessee except as provided in Paragraph 8.

19. Notices: Wherever in this Lease it shall be required or allowed that notice be given by either Party to this Lease to the other, such notice must be in writing and must be given personally or forwarded by certified mail addressed as follows:

Lessor:    Duke Energy Carolinas, LLC
Lake Services
526 South Church Street
Charlotte, North Carolina 28202

Lessee:    Lake Cruises, Inc.
c/o Deborah Harwell
1459 River Hwy
Mooresville, NC 28117-90

Such addresses may be changed from time to time by notice given hereunder.

20. Compliance with Federal, State and Local Laws: Lessee agrees that its use of the Leased Premises as herein provided shall be consistent with all FERC orders, regulations and requirements regarding recreational opportunities and development at licensed projects and use of Project lands and facilities, and all other applicable federal, state and local laws as well as all ordinances, rules, regulations and sanctions of any regulatory body or governmental agency (federal, state or local) having jurisdiction in the Leased Premises, and Lessee's use of the aforesaid Leased Premises shall comply with all applicable Lessor Shoreline Management Guidelines and will not endanger health, create a nuisance or otherwise be incompatible with the overall recreational use of the Project.

21. Reservation of Use: The right to use the Leased Premises which is the subject of this Lease for Project purposes is hereby reserved to the FERC Project licensee, its successors and assigns.

22. Non-Warranty, "AS IS": Lessor makes no representation or warranty, express or implied, and shall bear no responsibility as to the existing or future water quality or quantity in the Lake or the sufficiency or

Case 5:25-cv-00159-MEO-DCK    Document 1-3    Filed 10/02/25    Page 9 of 17

suitability of the Leased Premises for the uses authorized herein. Lessee accepts the Leased Premises in "AS IS" condition.

23. Protection of Environment: All necessary precautions shall be taken during construction and subsequent operation and maintenance of the activity to protect and enhance the environmental values of any affected lands and waters of the Project.

24. Archaeological Resources: If previously unidentified archeological or historical properties are discovered during the course of excavation/construction within the Leased Premises, the Lessee shall stop all land clearing or land disturbing activity in the vicinity of the excavation/construction area and notify Lessor immediately. Lessor shall initiate the required consultation process with the State Department of Archives and History, State Historic Preservation Office and the Catawba Indians Tribal Historic Preservation Office. Lessor may be required to prepare a cultural resources management plan for approval by the FERC that includes but is not limited to the following: (i) a description of each discovered property indicating whether it is listed on, or eligible for listing on the National Register of Historic Places, (ii) a description of the potential effect, and (iii) the proposed measures for avoiding or mitigating the impacts. The Lessee shall be responsible for implementing any required cultural resource management plan. No land clearing or land disturbing activities within the Leased Premises shall resume until authorized in writing by Lessor.

25. Sanitation: A commercially manufactured marine pump-out system must be installed and be available for use by occupants of the Leased Premises if the Lessee shall allow any one of the following: 1) the sale of boat fuel within the Project Boundary; 2) a total number of boat docking locations greater than or equal to sixty-five (65); or 3) the mooring of twenty-five (25) or more watercraft with Marine Sanitation Devices (MSD) with fixed holding tanks. The Lessee may be exempted from this requirement if written proof from a state or local agency having jurisdiction regarding waste disposal provides documentation that the facility cannot be permitted to dispose of waste collected from watercraft to the satisfaction of applicable regulations. Lessee shall maintain sanitation facilities as a regular and customary service for pumping and/or deposit of waste, if required under this paragraph.

26. Sedimentation and Erosion: Lessor shall not be responsible for any sedimentation, erosion, impacts of sedimentation or impacts of erosion caused by Project operations or otherwise. Lessee agrees that any damage it may suffer as a result of such sedimentation, erosion or their impacts shall not be claimed or charged against Lessor.

27. Flooding and Drawdown: Lessor reserves the right to back, flood, or draw down the waters of the Catawba River and its tributaries from time to time and at any and all times over and upon the Leased Premises or any portion of the same, to such extent the flooding or drawdown may be necessary or convenient in connection with the practical operation of its hydroelectric or other electric generation power plants located or to be located in the future upon the Catawba River and to the extent such flooding or drawdown is consistent with Lessor's obligations under its License, other applicable agreements, and applicable law. Lessee agrees that any damage it may suffer as a result of such flooding or drawdown shall not be claimed or charged against Lessor.

28. FERC Project Restoration: Lessor shall be under no obligation to Lessee to maintain or continue to operate the Project or Lake and should said Project or Lake be damaged, destroyed or removed, Lessor

shall be under no obligation to restore or rebuild same, and Lessee hereby waives all claims against Lessor for damages to or destruction or removal of the Project or Lake.

29. <u>Recovery of Fees and Costs</u>: If any action is taken by Lessor to enforce any provision, covenant or agreement contained in this Lease or if Lessor is required to retain an attorney to enforce any provision, covenant or agreement contained in this Lease (including, without limitation, the removal of an encroachment constructed on or in the vicinity of the Leased Premises in violation of this Lease) following written demand on Lessee, then Lessor shall be entitled to recover from Lessee all of Lessor's reasonable attorneys' fees and court costs incurred in such action and/or enforcement. Lessee shall be solely responsible for either performing or reimbursing Lessor for any related studies or actions that the FERC or any other federal or state agency may require of Lessor due to the Lessee's construction and subsequent operation of the marina facilities within the Project.

30. <u>Recordation</u>: In no event shall this Lease be recorded in any Public Registry or other public records by Lessee or on Lessee's behalf. Violation of the provisions in the immediately preceding sentence shall entitle Lessor to terminate the Lease rights granted herein. Lessor and Lessee acknowledge and agree Lessor shall record a Memorandum of Lease in the Public Registry in the county where the Leased Premises is located, and Lessor shall provide Lessee with a recorded copy of said Memorandum of Lease.

31. <u>Integration and Amendment</u>: It is agreed and understood that this Lease contains all agreements, promises and understandings between Lessor and Lessee and that no oral agreements, promises and understandings shall be binding upon Lessor or Lessee in any dispute, controversy or proceeding at law. Any addition, variation or modification of this Lease shall be void and ineffective unless made in writing and signed by Lessor and Lessee. It is further agreed and understood that Lessor will seek amendment to this Lease when required to comply with FERC orders, regulations and requirements and as required to ensure compliance with Paragraph 20.

32. <u>Duty to Mitigate</u>: If either Party breaches this Lease, then the breaching Party shall have the affirmative duty to use its best efforts to minimize any and all loss, damage or injury to the other Party as a result of such breach; provided that, the breaching Party shall not be liable in money damages for failure to mitigate damages of the other Party for which the breaching Party is not liable under Paragraph 14 of this Lease.

33. <u>Severability of Terms</u>: Unless provided otherwise in this Lease, should any term of this Lease or part hereof be held under any circumstances in any jurisdiction to be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of any other term of this Lease or other part of such term.

34. <u>Survival:</u> The provisions of Paragraphs 11 and 14 of this Lease shall survive any termination or expiration of this Lease. The conditions, warranties, obligations and agreements contained in Paragraphs 4 and 16 shall survive termination of this Lease (either at the end of the term or upon such earlier termination date as is provided herein) until the removal of the marina facilities to the extent required by this Lease or such removal is waived by Lessor. Additionally, any provisions of this Lease which require performance subsequent to the termination or expiration of this Lease shall also survive such termination or expiration.

35. <u>Existing Lease Amended and Superseded</u>: Beginning on the Effective Date, this Lease shall amend, restate, replace and supersede all previous leases or other agreements between Lessor and Lessee, or their

Case 5:25-cv-00159-MEO-DCK    Document 1-3    Filed 10/02/25    Page 11 of 17

respective predecessors in interest, for the use of the Leased Premises, and such prior leases or other agreements are no further force or effect.

**IN WITNESS WHEREOF**, the Parties hereto have caused this instrument to be executed by their duly authorized officials, effective as of the Effective Date written above.

**[Signatures Begin on Following Page]**

Case 5:25-cv-00159-MEO-DCK     Document 1-3     Filed 10/02/25     Page 12 of 17

**LESSOR:**
**Duke Energy Carolinas, LLC**
a North Carolina limited liability company

By: _____

Print Name: Eric J. Rouse
Title:   Manager, Leasing and Property Management


**LESSEE:**
**Estate of Jack R. Williams**

By: _____

Print Name: Deborah Boggs Harwell
Title:   Executrix

# EXHIBIT A



# EXHIBIT B

Rental: Lessee shall pay to Lessor an annual rental (the "Annual Rental") for use of the Leased Premises for each "Lease Year" during the term of this Lease. A "Lease Year" is January 1 through December 31 of each year. The Annual Rental shall be calculated by Lessor for each Lease Year as provided herein and billed to Lessee on or before March 31st of each Lease Year. The Annual Rental shall be paid by Lessee within sixty (60) days following Lessee's receipt of such invoice. Lessor may, in its sole discretion, impose a Two Percent (2%) per month late payment fee to be added to the Annual Rental for each month the Annual Rental is not paid in full.

The Annual Rental due hereunder for the first Lease Year (which begins on January 1 of the year following the lease Effective Date) shall be based upon an initial amount of $**5,400.00**, escalated as if the first Lease Year had begun on January 1, 2017, and had been escalated annually using the formulas below.

For example, if the first Lease year begins January 1, 2020, and the initial amount above is $150, the Annual Rental due for 2020 would be the initial amount of $150 escalated three times (i.e., January 1, 2018; January 1, 2019; and January 1, 2020) using the escalation formulas below.

Notwithstanding anything to the contrary contained in this Lease, commencing on January 1st of the second Lease Year, and on each January 1st of this Lease thereafter (each, an "Adjustment Date"), the Annual Rental shall be increased to the Annual Rental determined under the following formulas, rounded to the nearest $1 increment, provided that any such annual percentage increase shall not be more than Seven Percent (7%) of the Annual Rental for the previous year, although Lessor is under no obligation to institute increases or late payment fee in any given year:

Annual Rental = [(IR/IL) x Base Rental]

"Base Rental" shall mean the Annual Rental for the immediately preceding calendar year.

"CPI-U" shall mean the Consumer Price Index published by the Bureau of Labor and Statistics of the United States Department of Labor for all Urban Consumers, US City Average, all items not seasonally adjusted, for the applicable period.

"IR" shall mean the CPI-U published three (3) months prior to the Adjustment Date for the applicable Lease Year.

"IL" shall mean the CPI-U published fifteen (15) months prior to the Adjustment Date for the applicable Lease Year.

The following is a hypothetical example of the calculation of the new Annual Rental for any year during the term of the Lease:

"IR" is the CPI-U published three (3) months prior to the Adjustment Date for the applicable Lease Year (for example, assume 207.917).

"IL" is the CPI-U published one (1) year and three (3) months prior to the Adjustment Date for the applicable Lease Year (for example, assume 203.9).

The Annual Rental for the preceding year is $150.

New Annual Rental = 207.917/203.9 x $150 = $152.95.

1

The % increase in the Consumer Price Index is 1.97% ((207.917-203.9)/203.9)

Since the % increase is 1.97%, the Annual Rental is calculated with a 1.97% increase and would be $153, if Lessor chooses to initiate an increase. In this example, if the % increase in the Consumer Price Index had been 7% or greater, then the increase in the Annual Rental would be limited to 7% ($10.50) rounded to the closest $1, or $11 for a total of Annual Rental of $161.00, if Lessor chooses to initiate an increase.

In the event of a decrease in the Consumer Price Index for any period measured above, the Annual Rental shall not decrease, but shall remain the same for the Lease Year. Notwithstanding any rental increase for a particular year that may be calculated as provided herein, Lessor may, in its sole discretion, elect not to increase the Annual Rental in such year. In the event the Consumer Price Index is converted to a different standard reference base or otherwise revised, the determination of the Annual Rental for the second year and each succeeding year shall be made with the use of such conversion factor, formula or table for converting the Consumer Price Index as may be published by the Bureau of Labor Statistics, or if the Bureau should fail to publish the same, then with the use of such conversion factor, formula or table for converting the Consumer Price Index as may be published by any nationally recognized publisher of similar statistical information. If the Consumer Price Index ceases to be published and there is no successor thereto, such other index as Lessor and Lessee may agree upon shall be substituted for the Consumer Price Index, and if they are unable to agree, then such matter shall be submitted to arbitration in accordance with the then existing commercial rules of arbitration of the American Arbitration Association at the American Arbitration Association office nearest Licensee.

On every tenth anniversary of January 1st during the term of this Lease, Lessor may, at its option and in addition to any increase that would occur as a result of an increase calculated in accordance with the preceding paragraph, increase the Annual Rental for the next year in an additional amount equal to the Annual Rental for the immediately preceding year times the lesser of (i) 7%, or (ii) the aggregate percentage increase in the Consumer Price Index over the last ten (10) years, calculated by dividing the CPI-U published 3 months prior to the Adjustment Date by the CPI-U published 123 months prior to the Adjustment Date.

The following is a hypothetical example of the calculation of the adjustment to the Annual Rental scheduled to occur once every ten (10) years.

"IR-ADJ" is the CPI-U published three (3) months prior to the Adjustment Date for the applicable Lease Year (for example, assume 336.2).

"IL-ADJ" is the CPI-U published ten (10) years and three (3) months prior to the Adjustment Date for the applicable Lease Year (for example, assume 296.5).

The adjustment rate for the period is calculated at 13.39%. Since the increase would be greater than 7%, the adjustment rate applied is 7%

The Annual Rental for the preceding year is $167.

For the example, assume IR = 336.2 and IL = 331.9

The rate (current IR/IL) to be applied = 336.2/331.9 = 1.0130

New Tenth Year Annual Rental = (1+.013+.07) x $167 = $180.86 rounded to $181.00

2